28493. SOVEREIGN CAMP WOODMEN OF THE WORLD *v.* MULLER.

DECIDED OCTOBER 5, 1940.

*Plunkett & Scarborough,* for plaintiff in error.

*H. G. Dukes,* contra.

SUTTON, J. Mary E. Muller, as beneficiary, brought suit against Sovereign Camp of the Woodmen of the World (now Woodmen of the World Life Insurance Society) on an insurance certificate issued to her deceased husband, Harry A. Muller. The judge, hearing the case without the aid of a jury, rendered judgment

for the plaintiff. The exception is to the overruling of the defendant's motion for new trial on the general grounds. The following case is made by the record: On April 8, 1937, Muller made written application for membership in the defendant fraternal-benefit society, having a membership in Georgia in excess of 5000 and governed by the laws of this State regulating such a society or association, and for the issuance of a beneficiary certificate of membership in the sum of $1000, payable to his wife, Mary E. Muller. In the application Muller warranted that he was in good health, and answered in the negative all questions as to his having any disease or injury. The application provided, among other things: "I hereby consent and agree that this application, including the foregoing answers made by me, . . and all the provisions of the constitution, laws, and by-laws of the association, now in force or that may hereafter be adopted, shall constitute the basis for and form a part of any beneficiary certificate that may be issued to me by the Sovereign Camp of the Woodmen of the World, whether printed or referred to therein or not. . . I agree to make all payments for which I may become liable, as required by said beneficiary certificate and by the constitution, laws, and by-laws of the association, as now in force or which may be hereafter adopted, and at the time and in such manner and amount as may be provided by said beneficiary certificate and by said constitution, laws, and by-laws; and if I do not make said payments at the time and for the amount required and provided in said beneficiary certificate and in the constitution, laws, and by-laws of the association, the certificate issued upon this application shall be null and void, and all payments made by me shall be retained by the association." Based on this application, the association, on April 27, 1937, issued to Muller a certificate of membership in the sum of $1000, in which Mary E. Muller was named beneficiary of the insurance. This certificate was delivered to Muller on May 1, 1937. According to the terms, conditions, and provisions of the certificate, Muller was required to pay to the association, through the financial secretary of the local lodge or camp of which he was a charter member, $2.75 on or before the last day of each month, as installments of his annual assessment, and he was also obligated to pay a monthly sum of twenty-five cents as local camp dues. The installments were due on the first of each month, but he was allowed a grace

period of paying within the month. The following sections of the constitution, laws, and by-laws of the association formed a part of the contract, and were in force at the time Muller applied for a certificate, at the time it was issued to him, and at the time of his subsequent death:

"Sec. 4. The officers of the Sovereign Camp and of this society shall be president, vice-president, treasurer, secretary, seven auditors, escort, watchman and sentry, each of whom shall be a director, and said officers shall constitute the board of directors, and they shall by virtue of their election to such offices be representatives in the sessions of the Sovereign Camp until their successors are elected and installed."

"Sec. 82(a). No officer, employee, or agent of the society or the Sovereign Camp, Head Camp, or of any camp, has the power, right, or authority to waive any of the conditions upon which beneficiary certificates are issued, or to change, vary, or waive any of the provisions of this constitution or these laws, nor shall any custom on the part of any camp or any number of camps, with or without the knowledge of any officer of the society, have the effect of so changing, modifying, waiving, or foregoing such laws or requirements. Each and every beneficiary certificate is issued only upon the conditions stated in and subject to the constitution and laws, then in force or thereafter enacted, nor shall the knowledge or act of any officer or employee of this society constitute a waiver of the provisions of these laws by the society or an estoppel of this society. (b) The constitution and laws of the society now in force, or which may hereafter be enacted, the application and beneficiary certificate of membership shall constitute the contract between this society and the member."

"Sec. 109(g). The financial secretary shall not by acts, representations, or waivers, nor shall the camp by vote or otherwise, or any of its officers, have any power or authority to waive any of the provisions of the constitution, laws, by-laws of this society nor to bind the society by any such acts."

"Sec. 62. Annual payments and monthly installments thereof are levied against all members, beginning with the date on the certificate placed there by the secretary of the society."

"Sec. 63(a). In order to accumulate and maintain funds for the payment of the benefits stipulated in beneficiary certificates

held by the members of this society, as and when such benefits accrue, to maintain the reserves thereon, and to provide for the payment of the expenses of the society, every member of this society shall make to the financial secretary of his camp one annual payment in advance each year, or one monthly installment thereof, on or before the first day of each calendar month, as required by these laws [sec. 62] or by the provisions of his beneficiary certificate, which shall be credited to and known as the Sovereign Camp fund; and he shall also pay such camp dues as may be required by the by-laws of his camp. (b) If he fails to make any such payment on or before the last day of the month he shall thereby become suspended, his beneficiary certificate shall be void, the contract between such person and the society shall thereby completely terminate, and all moneys paid on account of such membership shall be retained by the society as his liquidated proportionate part of the cost of doing business and the cost of the protection furnished on the life of said member from the delivery of his certificate to the date of his suspension.

"Sec. 64. A person who becomes suspended for not making annual payments or installments thereof is not entitled to any benefits of this society. . .

"Sec. 65. Any person who has become suspended for not making any annual payment or installment thereof may within three calendar months from the date of his suspension again become a member of the society by the payment of the delinquent installment or installments, provided he is in good health at the time of such payment and remains in good health for thirty days thereafter. Whenever installments of payments are paid by or for a person who has become suspended for the purpose of again making him a member, such payment shall be held to warrant that he is at the time of making such payment in good health, and to warrant that he will remain in good health for thirty days after such attempt to again become a member, and to contract that such installments when so paid after he has become suspended for not making payments shall be received and retained without waiving any of the provisions of this section or of these laws until such time as the secretary of the society shall have received actual, not constructive or imputed, knowledge that the person was not in fact in good health when he attempted to again become a member.

Provided, that the receipt and the retention of payment of such installments in case such person is not in good health shall not make such person a member or entitle him or his beneficiary or beneficiaries to any rights whatever.

"Sec. 66(a). The retention by the society of any installments paid by or for any person after he has become suspended in order to again make him a member, shall not constitute a waiver of any of the provisions of this constitution, laws, and by-laws, or an estoppel upon the society. (b) Any attempt by a suspended person to again become a member shall not be effective for that purpose unless such person be in fact in good health at the time and continue in good health for thirty days thereafter, and the payment of any unpaid installment shall be a warranty that such person is at the time in good health and that if the warranty is not true the certificate shall be null and void."

"Sec. 109(d). He [the financial secretary of the camp] shall deliver or forward to the last-known post-office address of the person paying the same a receipt for all money paid due the camp, pay the dues to the banker, taking his receipt therefor, and attest all beneficiary certificates. He shall not make the payment of any member with camp funds or his own funds unless the same is paid on or before the last day on which such payment is due and payable, and must make a record of the time of any such payment. Such payment can not be made by him or the camp after the member becomes suspended."

"Sec. 97(d). No camp shall pay any installment of payment of any member unless the same is actually transferred from the camp's funds into the hands of the financial secretary on or before the last day of the month in which such installment of payment is due and payable by the member, and the financial secretary shall enter such payment upon his records, showing the date it was paid by the camp."

"Sec. 111. On or before the fifth day of every month the financial secretary of each camp shall remit all the Sovereign Camp funds in his hands and all other funds due the society to the secretary of the society. . . Accompanying such remittances, the financial secretary shall also forward such detailed statements of the standing of the members in the camp as shall be required for the information of the secretary of the society, upon blanks furnished for that purpose.

"Sec. 112. If the remittance which should have been forwarded through the proper officers on or before the fifth day of the month, as required by section 111, has not been received by the secretary of the society on or before the fifteenth day of that month, the camp and all its members shall stand suspended, and shall not be reinstated, except as provided in section 91 of this constitution, until payment of all money due from said camp to the society shall have been received and accepted by the secretary of the society. Provided, that such suspension shall not render void the certificate of membership held by any member until the expiration of the full time for which he has paid installments and dues."

"Sec. 91. A member in good standing in a camp at the time of its suspension or dissolution may, within sixty days from the date of its suspension or dissolution by the Sovereign Camp, on payment of all arrearages and installments for current month and 25 cents to the secretary of the society, receive from him a transfer card on which he shall be admitted to membership in any other camp, if presented within thirty days from its date, accompanied by the prescribed camp fee, under the restrictions required for again becoming a member by a suspended person."

"Sec. 81. When a beneficiary certificate has been in force for two consecutive years during the life of the member, the payment thereof shall not be contested on any other ground than suspension; or that any beneficiary, whether sane or insane, caused the death of the member, or is accessory thereto; or that he died by the hands of justice; or that he misstated his age in his application; or in case of presumed death on account of absence or disappearance."

"Sec. 57. First: The certificate is issued in consideration of the representations, warranties, and agreements made by the person named therein in his application to become a member, in the form and as passed upon and accepted by the medical director, and in consideration of the payment made when introduced in prescribed form; also his agreement to make all payments and dues that may be levied during the time he shall remain a member of this society. Second: If the admission fees, dues and Sovereign Camp fund payments required of the person named in the certificate are not paid to the financial secretary of his camp as required by the constitution and laws of this society, the certificate shall be null

and void, and all moneys paid on account of such membership shall be retained by the society as the liquidated proportionate part of the cost of doing business and the cost of the protection furnished on the life of said member from the delivery of his certificate to the date of his suspension."

"Sec. 59. The non-compliance with any of the several conditions precedent named in these laws shall be an absolute bar to any claim on the beneficiary fund of this society, under or by virtue of any beneficiary certificate that may have been issued, or that may hereafter be issued to an applicant, or by reason of any steps taken by an applicant to entitle him to the same, or by a subordinate camp or member thereof; and no deputy, officer, member, or employee of the society, or of the Sovereign Camp, Head Camp, or subordinate camp, has any authority to change, alter, modify, or waive the foregoing requirements or the consequences thereof in any manner."

All payments supposed to be made on the certificate of Muller were paid in his lifetime, but there were some departures from the contract, and about them the present controversy revolves. The amount of $2.75 due in September, 1938, as an installment of the annual premium was not paid in that month, and in the report for September, dated October 10, 1938, and received by the home office of the defendant on October 14, 1938, no remittance for that membership was shown. However, this installment, together with the one to be paid in October, was paid before the report for October was mailed. The report for October was received at the home office on November 16, 1938. The receipt for November, 1938, installment was dated December 12, 1938, and the installment was reported paid in the report for November, dated December 10, 1938. The receipt for December, 1938, installment was dated January 14, 1939, and the installment was reported paid in the report for December, dated January 10, 1939. The receipt for January, 1939, installment was dated February 13, 1939, and the installment was reported paid in the report for January, dated February 11, 1939. The receipt for February, 1939, installment was dated March 13, 1939, and the installment was reported paid in the report for February, dated March 10, 1939. The receipt for March, 1939, installment was dated April 13, 1939, and the installment was reported paid in the

report for March, 1939, dated April 11, 1939. The receipt for April, 1939, installment was dated May 15, 1939, and the installment was reported paid in the report for April, 1939, dated May 15, 1939. The receipt for May, 1939, installment was dated May 27, 1939, and the insured died on May 30, 1939, and remittance was made to the home office with the death proofs which were received by the home office on June 19, 1939. It was only after the receipt of the death proofs that the society learned that Muller had been ill for some time, that he was probably in ill health in September, 1938, and in April, 1937, when the certificate was issued to him. On July 11, 1939, the society first learned that the April, 1939, installment was not paid until May 15, 1939, and upon learning this it rejected the claim of the plaintiff, tendering to her a return of all installments paid subsequently to the August, 1938, installment. This tender was refused by the plaintiff, who claimed that she was entitled to the face amount of the certificate; and thereafter the money was paid into court.

The evidence as to Muller's ill health consists of letters from two physicians, admitted in evidence with the consent of the plaintiff, who did not admit the truth of the facts contained therein, but agreed that they should have the same weight as if the writers of the letters were present and testified under oath to the facts. It was shown by these letters, that on April 10, 1939, Muller consulted a physician, who at that time diagnosed his condition as bronchial asthma, bronchiectasis, and pneumonokoniosis; that on April 15, 1939, he was suffering from excruciating abdominal pains, and hospitalization was recommended; that on April 16, 1939, he was in a deep coma and evidently suffering from a cardiac-pulmonary condition, and was sent to a hospital, where he remained through April 18, 1939; that previously an x-ray examination of his chest had been made with diagnosis of pneumonokoniosis; that Muller had given a history of having worked as a miner in his youth; that his pathological condition evidently dated back to that time; that his cardiac condition was due primarily to his pulmonary condition; that after being discharged from the hospital on April 18, 1939, he was seen by a physician several times in April and May, 1939, and had a rather advanced myocarditis secondary to pneumonokoniosis. It thus appears conclusively that the insured was not in good health when the April, 1939, installment was paid

on May 15, 1939, and that he did not continue in good health for thirty days thereafter, inasmuch as he died on May 30, 1939. Other than as to the failure to pay the September, 1938, installment in that month, the defendant did not know, until after receipt of the death proofs on June 19, 1939, that any installment had been paid after the last day of the month in which, under the contract and days of grace therein provided, it was to be paid. On July 11, 1939, it first learned, through a letter from the financial secretary of Muller's camp, that the April, 1939, installment was not paid until May 15, 1939. It did not know until a short time before the trial that the November and December, 1938, and January, February, and March, 1939, installments were not paid during the months in which, under the contract, they should have been paid.

The society set up in its answer that the member became suspended on October 1, 1938, and forfeited his rights under the certificate, because he was not in good health on November 12, 1938, at the time of his attempted reinstatement, and did not remain in good health for thirty days thereafter, and that he also became suspended on May 1, 1939, and forfeited his rights under the contract, because he was not in good health on May 15, 1939, at the time of his attempted reinstatement, and did not remain in good health for thirty days thereafter. However, in its brief only the suspension as of May 1, 1939, is insisted upon, it being conceded that under *Sovereign Camp Woodmen &c.* v. *Heflin,* 188 *Ga.* 234 (3 S. E. 2d, 559), it is estopped to claim a forfeiture as of October 1, 1939. The questions here involved are: Did the member become suspended on May 1, 1939? If so, was the attempted reinstatement as of May 15, 1939, ineffective? According to the contractual provisions above set forth, the monthly installments became due on the first day of each month, but the member had days of grace for the rest of the month in which to pay. If he failed to pay an installment within the month in which it was due, he would automatically become suspended, and his certificate would lapse. However, he had the right to become reinstated by paying such installment within three calendar months, provided he was then in good health, which payment was to be taken as a warranty that he was then in good health and that he would so remain for a period of thirty days thereafter, it being provided that the acceptance by the society of any such delinquent install-

ment would not estop it from asserting that he was not in good health, unless and until it had, at the time of such acceptance, not constructive or imputed notice, but actual knowledge of such fact. It is shown by the evidence that the member failed to pay the April, 1939, installment on the first day of that month, and that he did not pay it within the month of April. Necessarily, then, he became automatically suspended on May 1, 1939. The attempted reinstatement by paying the April installment on May 15, 1939, could become effective only in the event he was at that time in good health and remained so through June 14, 1939. The evidence conclusively shows, and plaintiff apparently so concedes, that on May 15, 1939, the member was afflicted with serious cardiac and pulmonary complications, from which trouble he died on May 30, 1939, and hence it follows that after his suspension on May 1, 1939, he never became reinstated.

The defendant in error contends, however, that inasmuch as the financial secretary of the camp of which Muller had been a member accepted overdue payments from him in November and December, 1938, and January, February, and March, 1939, he was induced to believe that any installment paid in a reasonable time after the due date would continue him as a member in good standing, and that he did not become suspended on May 1, 1939, because the April installment was paid in a reasonable time, to wit, on May 15, 1939, and that before the member died on May 30, 1939, the May installment had been paid on May 27, 1939; that the society, by the acceptance of the belated payments waived a strict compliance with the contract and was estopped from asserting a forfeiture. These contentions are controlled adversely to the defendant in error by *Sovereign Camp Woodmen* v. *Hart,* 187 *Ga.* 304 (200 S. E. 296). In that case the member made payments for several months in accordance with the contract, but afterwards did not pay a number of installments in the respective months in which they were due, although the society was not aware that the payments when paid late were not paid in time. The installment for August, 1935, after several instances of delay in payments, was paid on September 10, 1935. The September, 1935, installment was never paid or tendered and the member died on October 13, 1935. The society declined to make payment to the beneficiary, on the ground that Hart became automatically suspended on October 1,

1935, by reason of his failure to pay the September installment on or before the last day of September, 1935. The plaintiff contended that because of the acceptance by the financial secretary of Hart's camp of his overdue installment the society was estopped to avoid the certificate. In the opinion it was ruled:

"While, in view of the provisions of the Code, § 20-116, that 'where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given the other of intention to rely on the exact terms of the agreement,' it may be stated as a general rule that where an insurer, by his custom and course of dealing with the insured, in receiving without objection premiums and assessments past due, when he could have insisted upon a forfeiture of the policy, has induced the belief on the part of the insured that premiums or assessments will be received by the insurer within a reasonable time after their maturity, the insurer can not subsequently claim a forfeiture of the policy because another premium or assessment was not paid on the date due, the payment being made within a reasonable time thereafter (*Cotton States Life Ins. Co.* v. *Lester,* 62 *Ga.* 247, 35 Am. R. 122; *Carolina Life Insurance Co.* v. *Moultrie,* 40 *Ga. App.* 15, 148 S. E. 628, and cit.), yet where, as in the instant case, the insurer is a fraternal benefit association which has issued a beneficiary certificate insuring the member, which certificate pursuant to law (Code, § 56-1610), has provided therein that the 'articles of incorporation, the constitution, laws and by-laws of the association now of force and all amendments,' etc., 'shall . constitute the agreement between the association and the member,' and the constitution, laws, and by-laws contain provisions that no officer, employee or agent of the Sovereign Camp or any local camp has the power to change, vary or waive any of the provisions of the constitution or by-laws, 'nor shall any custom on the part of the camp or any number of camps, with or without the knowledge of any officer of the association, have the effect of so changing, modifying, waiving, or foregoing such laws or requirements . . nor shall the knowledge or act of any officer or employee of this association constitute a waiver of the provisions of these laws by the association or an estoppel of this association,' and that if the member 'fails to make

any such payment [of dues or assessment] on or before the last day of the month, he shall thereby become suspended, his beneficiary certificate shall be void,' such provisions are binding upon the insured member (Code, § 56-1624; *Willis* v. *Sovereign Camp,* 29 *Ga. App.* 470, 116 S. E. 52; *Sovereign Camp* v. *Wheeler,* 39 *Ga. App.* 395, 146 S. E. 917); and where, as in the instant case, the financial secretary of the local camp merely accepted a series of dues after the due date thereof, the member, by operation of the terms of the contract, became actually suspended without affirmative or judiciary action on the part of the association issuing the certificate. *Sovereign Camp* v. *Shaw,* 143 *Ga.* 559 (85 S. E. 827); *Bryant* v. *Sovereign Camp,* 29 *Ga. App.* 359, 360 (115 S. E. 285)."

The contract of insurance in that case contained provisions similar to those in the present contract against waiver or estoppel on the part of the society because of acts of the financial secretary, and it was further said in the *Hart* case: "Such action of the financial secretary of the local camp, that is the mere acceptance of a series of late payments of dues, will not operate of itself as a waiver by the association of such previous suspension or forfeiture; this for the reason that, such receipt of dues in default being specifically provided for under the terms of the contract itself, no departure from the terms of the contract is shown by the mere acceptance of a series of dues in default. . . Nor would the fact that the financial secretary of the local camp falsely reported the member as paying on time create an estoppel on the part of the insurer to insist upon the strict terms of the contract, the member as a matter of law knowing of the terms of the contract providing for the acceptance of late payments, and there being no evidence that the member knew or had reason to believe that the payments were being accepted as made on time or that the member was induced by such acts of the financial secretary to believe that the late payments were being accepted as made on time rather than under the terms of the contract specifically providing for the acceptance of dues in default. Under such circumstances it is only fair to assume that it was the intention of both parties to abide by the terms of the contract. Accordingly the elements of estoppel are lacking."

It is further contended by the defendant in error that under the *Heflin* case, supra, the acceptance of belated installments after

the member became suspended on October 1, 1938, and had attempted to become reinstated by paying the September installment on November 12, 1938, estops the society from asserting that he was not in good health at the time of the attempted reinstatement on May 15, 1939, and that he did not remain in good health for thirty days thereafter. The decision in the *Heflin* case is not authority for the contention urged. That decision assumed that forfeiture had taken place, and the question at issue was as to the validity of the member's reinstatement, the provisions in the contract of insurance in that case, with respect to reinstatement, being the same as in the present case. The *Heflin* case was in the Supreme Court on certiorari from the decision in 59 *Ga. App.* 299 (200 S. E. 489), and the facts were as follows: The member made payments of all installments until January 11, 1936, when he defaulted, but on February 10, 1936, he paid the January and February installments. He defaulted in payment of the March installment but, on April 16, 1936, paid the March and April installments. He continued paying installments until July, when he again defaulted, but paid the July and August installments on August 10, 1936. He paid the September and October installments, but defaulted in November, paying the November and December installments on December 15, 1936, and thereafter continued to pay all installments due to the time of his death in April, 1937. The Supreme Court held that where, under the contract, a member had become suspended and, in order to become reinstated, the past-due installment had been paid by or for him within three calendar months, while the retention by the society of any paid installment accruing within the thirty-day period following the date of the attempted reinstatement shall not constitute a waiver of any of the provisions of the society's constitution, laws, or by-laws or an estoppel upon the society, still, under the maxim, "expressio unius est exclusio alterius," the "unconditional acceptance of premiums accruing *after* the 30-day period will operate to estop the association from raising the question that the insured did not remain in good health during the thirty-day period, and that this fact was unknown to the association at the time of its acceptance and retention of the subsequent premiums. See Broom's Legal Maxims (8th ed.), 504 et seq.; 25 C. J. 220, and cit. The member with whom the association contracted was thus authorized to con-

strue the reasonable intendment of the reinstatement provision to be that the only penalty which the association saw proper to impose on a member was that all protection under the policy was suspended during the thirty-day period following his reinstatement, with the result that the payment of subsequently accruing premiums would operate to restore him to the same status as existed prior to his default. Accordingly, under this interpretation of the policy, where after the payment in good faith of the reinstatement premium, but during the 30-day period immediately thereafter, the member became in bad health, irrespective of whether or not the association would be compelled to accept the payment of subsequently accruing premiums, the fact that it did so would operate to estop it from claiming that the policy was never legally reinstated." Under the decision in that case the society is estopped from asserting that the member did not become reinstated in making payment on November 12, 1938, for the September, 1938, installment, inasmuch as the society accepted payments for several months *after* the thirty-day period immediately following the date of the attempted reinstatement on November 12, 1938. The provision relieving the society against any imputation of waiver or estoppel by reason of accepting a belated installment applies only to such payments as are made within the thirty-day period in which, following his attempted reinstatement, the member must remain in good health to actually effectuate a reinstatement. The plaintiff in error concedes that the member must be regarded as having reinstated himself in November, 1938, because it can not assert that he did not remain in good health for thirty days thereafter. But it contends, with good reason, that inasmuch as Muller became suspended again on May 1, 1939, by reason of not paying the April installment in time, and because it is conclusively shown that he was in bad health on May 15, 1939, the date of his attempted reinstatement, whether he was in fact in bad health or not before that time, and did not "remain in good health" for thirty days after May 15, 1939, it is not estopped by any principle ruled in the *Heflin* case from asserting that Muller never effectually reinstated himself by the May payment. The payment for the May installment was made for him by the financial secretary of the local camp on May 27, 1939, and was received by the society, together with proofs of death, on June 19, 1939, but was not accepted, and was, with

amounts covering other belated installments, tendered to the plaintiff by the society. It was, therefore, not in the position of having retained any belated installment after the thirty-day period following the attempted reinstatement on May 15, 1939.

Counsel for the defendant in error contend that the facts of the present case do not bring it within the *Hart* case, supra, in that, it is averred, the insured was induced by the acts of the local camp secretary and the society to believe that the belated payments were being accepted as made in time, and that payment in a reasonable time after the days of grace would prevent a forfeiture. In support of these contentions it is set out that the secretary reported the member as paying in time; that the society accepted the payments, and thereafter, in sending to the camp secretary a report blank, showed the insured as a member in good standing and recognized him as such by continuing to make new assessments against him in the report blanks; that the report was not required to reach the home office before the 15th of the month following the month in which an installment was due, and the society really did not expect a strict compliance with the written contract, and its act negatives any idea that forfeiture would result if payment was not so made, in that the report blank shows amounts to be collected and from whom to be collected, and not always reaching the camp secretary before the end of the month in which an installment was to be paid recognizes that a payment due in one month and made in time to be included in a report subsequently rendered for such month would be sufficient to keep the certificate in force; that the camp secretary showed the member in good standing in all reports from November, 1938, and subsequent months; that the society accepted and approved the reports reaching it after the 15th of the month, and that although the contract provided for suspension of the entire local camp where the reports did not reach the home office by the 15th, the society did not exercise the right of suspension and the member was not suspended for failure to pay the April installment on or before the last day of that month; that under the custom followed the payment of April dues on May 15th was in a reasonable time, and that the May dues were paid according to the contract, to wit, on May 27th, and consequently the insured never became suspended and the insurance was in force at the time of his death. The uncontradicted

evidence shows that the payments for November and December, 1938, and January, February, March, and April, 1939, were not paid within the months required to be paid. The monthly reports of the camp secretary showed that payments had been made, but did not give the dates. The money was not remitted until the reports were mailed to the home office, but there was nothing in the reports to apprise the society that payments had not been made in time. The mere fact that the camp secretary incorrectly or falsely certified to the correctness of the reports would not create an estoppel on the society to insist upon the strict terms of the contract. *Sovereign Camp* v. *Hart,* supra. The construction of the report blanks as insisted upon by counsel for the defendant in error, that they showed that the society recognized the insured as a member in good standing and continued to make *assessments* against him as such, and authorized him to believe that payments made in a reasonable time after the month in which due would be sufficient to avert a forfeiture, can not be sustained. These report blanks, while furnished by the society, were for the use of the local camp secretary, and as forwarded to the camp secretary with certain writings therein did not amount to admissions or representations by the society of the status of the insured. Each was headed "Financial Secretary's Report." According to the provisions of the contract, this report was to be rendered on the 5th of the month, to be mailed so as to reach the home office of the society not later than the 15th. Its columns were headed: "Names of Members," "Monthly Rates," "Additions, Payments, Renewals," "Deductions, Suspension," "Remarks, Date, Payments Renewed." As a guide to the camp secretary it listed the names of putative members with the respective monthly installments assessed by the certificates when issued. The other blank columns, as headed, show that the form was one which was to be filled in by the secretary with information as to payment or suspension, etc. He might have made his own form of report, but it was obviously the desire and purpose of the society to have a general form. The secretary testified that the report blank contained the names of members as shown by his previous report. Merely because the society listed the names of putative members, the exact status to be determined by the true report of the camp secretary, it does not follow that the society was thereby recognizing them as members

in good standing, but the names were listed for the obvious purpose of showing those regarding whom a report was desired.

The report blank, according to the testimony of the camp secretary, usually reached him between the 27th and the end of the month in which payment was required to be made, but sometimes did not arrive until the 2nd or 3rd of the following month. It could not reasonably be said that the mere showing of the amount of an installment supposed to be paid by the insured according to the terms of the contract amounted to an assessment and, therefore, a recognition of membership in good standing. It was only the showing of the amount of a monthly *installment* which was *assessed* at the time of the issuance of the certificate. "Annual payments and monthly installments thereof *are levied against all members beginning with the date of the certificate placed there by the secretary of the society."* (Italics ours. Sec. 62 of the contract.) It is true that in several instances the *camp* secretary delayed sending in reports that were not received by the home office until after the 15th of the month, but, as stated, they carried no suggestion other than payments were made in time, and the receipt of such reports, together with money supposed to have been paid in accordance with the contract, does not amount to a ratification of an unknown, unauthorized act of the camp secretary. Nor does the fact that the society failed to avail itself of the provisions of sec. 112 of the contract and declare the local camp and all of its members suspended, because it did not receive by the 15th of the month reports for several months prior to April, 1939, amount to a waiver of suspension, or estop the society from declaring the member suspended for *not paying* the April installment in time. The failure to suspend the camp did not injure him in any way or lead him to believe that he might delay paying any installment beyond the end of the month in which it was required to be paid, and, indeed, there is no evidence that he knew that any report was not received before the 15th of the month.

Even if it be assumed that the society waived suspension of the local camp for the reason urged, it does not follow that it waived the prompt payment of dues. The waiver of one thing does not constitute a waiver of an entirely different thing. See *Thornton* v. *Travelers Insurance Co.*, 116 *Ga.* 121 (5) (42 S. E. 287, 94 Am. St. R. 99). Whether the camp was suspended or not would

not work any injury to the insured if his dues were paid in time. Under sec. 112 such suspension would "not render void the certificate of membership held by any member until the expiration of the full time for which he has paid installments and dues," and under sec. 91 "A member in good standing in a camp at the time of its suspension or dissolution may, within sixty days from the date of its suspension or dissolution by the Sovereign Camp, on payment of all arrearages and installments for current month and 25 cents to the secretary of the society, receive from him a transfer card on which he shall be admitted to membership in any other camp, if presented within thirty days from its date, accompanied by the prescribed camp fee, under the restrictions required for again becoming a member by a suspended person." Whether or not a camp be suspended for the reason mentioned, a member thereof is fully protected if he pays his installments on time and avails himself of the provisions of sec. 91, and no harm could be said to have come to the insured in the present case by the failure of the society to suspend his local camp because the reports of the camp secretary were in some instances not received by the society by the 15th of the month. For no reason urged by counsel for the defendant in error can it be said that the insured was not suspended for failure to pay the April installment in that month, and, as already shown, he never became reinstated, because at the time of the payment of the April installment on May 15, 1939, he was not in good health and did not "remain in good health" for thirty days thereafter, but died on May 30, 1939.

Under the law and the evidence the judge erred in rendering judgment for the plaintiff and in overruling the defendant's motion for new trial.

*Judgment reversed. Stephens, P. J., and Felton, J., concur.*