H. Paige ZIEGLER, Plaintiff-Appellant,

v.

The NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, Defendant-Appellee.

No. 20460.

United States Court of Appeals, Eighth Circuit.

May 3, 1971.

———◆———

Robert W. Dygert, Dygert & Gunn, and Charles R. Hall, Minneapolis, Minn., for plaintiff-appellant.

Ludwig B. Gartner, Jr., Minneapolis, Minn., Rex Roberts, Nashville, Tenn., for defendant-appellee; Faegre & Benson, Minneapolis, Minn., of counsel.

Before MATTHES, Chief Judge, VAN OOSTERHOUT and GIBSON, Circuit Judges.

GIBSON, Circuit Judge.

The plaintiff in this diversity case, H. Paige Ziegler, brought suit for $45,000, the proceeds of an alleged $15,000 triple indemnity life insurance policy on the life of his son, Thomas P. Ziegler, who was killed in an automobile accident on November 23, 1968. The case was tried to a jury before Judge Earl R. Larson, United States District Court for the District of Minnesota, and at the close of all the evidence, Judge Larson granted defendant's motion for a directed verdict. The trial court concluded that the only reasonable construction to which the evidence and exhibits lent themselves was that the insurance in question never became effective on the life of Thomas Ziegler, and, even assuming an oral contract of insurance was reached, it was canceled prior to the insured's death on November 23, 1968. Plaintiff now appeals from the judgment entered upon the directed verdict and from the order denying plaintiff's alternative motion for judgment n. o. v. or a new trial. We affirm.

In reviewing this directed verdict, both federal and Minnesota law require us to view the credibility of the evidence and any inferences which may reasonably be drawn therefrom in a light favorable to the adverse party.

On October 7, 1968, an agent for defendant The National Life & Accident Insurance Company, Steve Hokanson, made a life insurance sales presentation to plaintiff's son, Thomas, who was a senior at Gustavus Adolphus College in St. Peter, Minnesota. National Life agents are trained to use a canned 10-typewritten-page oral sales presentation, and Hokanson, a friend and fraternity brother of Tom's, testified that he followed it closely in his presentation. Thomas Ziegler was interested in National Life's "College Shield" program, which offers relatively large amounts of life insurance with optional disability benefits for a nominal down payment the first year with the balance of the normal first year's premium being deferred until the fifth anniversary of its policy date, when the policy provides a cash dividend large enough in most cases to liquidate 98 per cent of the balance due on the first year's premium including interest.

Agent Hokanson testified that he followed that part of the prepared presentation which emphasized the insurance policy would immediately go into effect assuming the applicant is able to qualify on the Preferred Rating all the way through. Hokanson filled out the entire application based on Tom's answers to his questions. He then showed Tom where to sign and told him that the two-page document basically just said that "Everything that you have told me in the application is true, to the best of your knowledge." The application which Tom signed contained the following limitation on coverage:

"* * * except as otherwise provided in the Conditional Receipt bearing the same date as this application, no contract of insurance shall be effective unless and until a policy has been issued and delivered to me during my lifetime and good health and unless

the full first premium on said policy shall have been paid."

Since Tom was unable to pay an annual, quarterly or monthly premium, he agreed to pay the first year's premium by tendering a check for $10.45 and his signed promissory note for $226. As Tom was only twenty years of age, agent Hokanson explained that the note would have to be co-signed by Tom's father since minors are incapable of executing a binding note under Minnesota law.

Attached to the application was a "Conditional Receipt," which is designed to be filled out and given to the applicant at the time the application is signed. The Conditional Receipt states that the life insurance policy goes into immediate effect only if the "deposit is at least equal to one monthly premium on the policy applied for * * *." The evidence indicates that it is doubtful that Tom was given this receipt.

That same evening Hokanson mailed Tom's application and check to the agency manager and Tom's note to his father, and Tom called his father and told him he had taken out a new life insurance policy for $15,000 from Steve Hokanson and that something would be following on which his father's signature was required. The plaintiff received the note on October 9, and, acting under the mistaken impression that the note was due immediately, refused to co-sign it. He also advised Tom against this policy and recommended he purchase term insurance and invest the difference.

National Life received Tom's application and check in Nashville, Tennessee, on October 11. It was noted on the application that Tom's promissory note would follow within six days as soon as it was co-signed. National Life cashed Tom's check (the proceeds were placed in the home office account) and began processing his application. The policy was processed in due course, dated October 22, and sent to agent Hokanson with two copies of an acceptance letter and a transmittal letter requiring Hokanson to secure a completed co-signed promissory note for $234.30 (the original rate calculation was erroneous) from Tom before delivering the policy. Although Hokanson received these documents and instructions on October 25, he did not meet with Tom again until November 21. While this delay apparently was due to missed connections, Hokanson made no special effort to contact Tom since he assumed Tom was covered. Hokanson admitted in his deposition that it had never been called to his attention that paying an amount equal to a monthly premium might make a difference in coverage under the policy.

Tom turned 21 on November 5. While home to celebrate his birthday on November 8 or 9, he discussed the policy with his parents. Mrs. Ziegler testified that Tom had at that time decided to keep the policy as he thought he could pay the note with his income tax refund.

Hokanson testified that when he met with Tom on November 21, Tom stated he had decided not to stay with the insurance program. Hokanson explained to Tom that since he was now 21, his promissory note would be acceptable to the company without his father's co-signature, but Tom refused to sign a new note (which was needed due to a premium increase that went into effect October 1, six days prior to Tom's application). After a 45-minute discussion of the opportunities Tom would be passing up by this decision, Hokanson kept the policy and told Tom the company needed a written release of liability. Since Hokanson didn't have a release with him, an appointment was made to bring one the following Sunday evening, November 24.

Tom Ziegler died as a result of an automobile accident on November 23. After learning of Tom's death, the company delivered its check for $10.45 to plaintiff in early December as a refund of Tom's application deposit. This check was returned to the company by plaintiff's counsel.

The evidence is clear that a written contract of insurance never became effective on the life of Thomas Ziegler. Indeed, plaintiff does not contend that

a written contract of insurance was reached under the terms and limitations set forth in the College Shield policy or the Conditional Receipt attached thereto. Rather, he contends that since the company's sales presentation emphasized immediate coverage and deferred premiums, it had an affirmative duty to call Tom's attention to the provisions of its application and Conditional Receipt which limited the circumstances under which coverage would be immediate. Plaintiff reasons that since the agent breached this affirmative duty and since the company cashed Tom's check, administratively processed his application and issued his policy without receiving his co-signed note, the company waived the co-signature requirement for coverage. In the alternative, it is asserted that an oral contract of insurance for immediate coverage was created by the agent's repeated assurances that the applicant would be covered "as of today."

The application Tom signed on October 7 provided that insurance on his life could become effective in two ways. Interim insurance effective immediately was available under the Conditional Receipt if his deposit amounted to as least one monthly premium and if no medical examination was required and the policy could be issued as applied for. The College Shield policy itself, issued pursuant to the application, became effective only if the full first premium (monthly, quarterly or annual) were paid and if the policy were issued and delivered during the applicant's lifetime and good health.

■■ No interim insurance coverage was created under the Conditional Receipt because Tom's cash deposit for $10.45 was less than one monthly premium on the policy, an express condition precedent to the creation of interim insurance. Tom's promissory note which was neither co-signed nor delivered to the company cannot be considered as part of the prerequisite deposit. Moreover, even had Tom paid a full month's premium and created interim insurance coverage, his interim coverage would have terminated under the express provisions of the Conditional Receipt when agent Hokanson tendered the policy to him on November 21.

No life insurance coverage was created under the College Shield policy applied for by Tom because he failed to make advance payment of the first full premium and because the policy was never delivered to Tom. There is no evidence that National Life waived payment of the premium as plaintiff contends. The record is clear that Hokanson advised Tom that both the $10.45 cash deposit and the co-signed promissory note for the balance of the first year's premium were required before the policy became effective. Tom telephoned his father the night of October 7 and told him he had purchased life insurance from Steve Hokanson and something would be coming in the mail from Hokanson for his signature. Furthermore, when Hokanson tendered the policy to Tom on November 21 and asked him to sign a new note, Tom refused to execute a new note in payment of the premium, which he then was capable of doing as he had reached his majority. Upon Tom's refusal to sign the new note, Hokanson retained the policy in accordance with the company's instructions.

■■ Tom's refusal to execute a new note and accept the policy on November 21 was an unequivocal expression of his intention not to take out the insurance. Furthermore, Hokanson's retention of the policy was also sufficient to preclude the creation of a contract. Sawyer v. Mutual Life Ins. Co., 166 Minn. 207, 207 N.W. 307 (1927). And, obviously, the mere ministerial acts of the company in preparing and forwarding the policy to Hokanson before receipt of the co-signed promissory note did not constitute a waiver of payment. St. Paul Fire & Marine Ins. Co. v. Bierwerth, 285 Minn. 310, 321, 175 N.W.2d 136, 143 (1969).

■ Despite the fact that the Conditional Receipt which contained the interim insurance provisions is unaccounted for and quite likely was not filled out and given to Tom, the record indicates

Tom understood that immediate coverage under the policy was dependent upon his delivery of his co-signed note to the company. Therefore, plaintiff's contention that an oral contract of insurance was created can be limited to consideration of whether an oral contract for interim insurance was formulated. Although the application expressly limited the authority of the agent and prohibited him from altering its terms, Hokanson was under the impression that Tom was covered as of October 7. However, even should we assume creation of a parol contract of interim insurance was within the apparent authority of Hokanson, *see* Pesina v. Juarez, 288 Minn. 379, 181 N.W.2d 109, 112–113 (1970), there is nothing in the record to indicate Hokanson's impression that Tom was covered resulted from his having made representations to Tom about interim coverage. Undoubtedly Hokanson's misunderstanding as to immediate coverage was due to the fact that in the great majority of cases the college senior applicant was 21, and a $10.45 payment, accompanied by a binding signature on the note, was sufficient alone to constitute payment of the first year's premium. We believe it is common knowledge that a substantial majority of all college seniors are at least 21 years of age when they begin their senior year of college, which class level of course is a prerequisite to eligibility for the College Shield policy. Thus, we think it is apparent that no oral contract of insurance was created.

Furthermore, any possible oral contract for interim insurance which may have been created would not have extended beyond November 7 since the $10.45 deposit paid by Tom was less than a monthly premium. In addition, as discussed with regard to interim insurance under the Conditional Receipt, any interim insurance created would have terminated on November 21 at the time Hokanson tendered the policy to Tom. Tom's refusal to accept the policy and to sign a new note in payment of the premium constituted a repudiation of any possible oral contract of insurance then in effect. This repudiation coupled with National Life's acquiescence effects a rescission of any possible oral contract in existence. Country Club Oil Co. v. Lee, 239 Minn. 148, 58 N.W.2d 247, 251 (1953).

We conclude that the District Court properly directed the verdict for the defendant. The evidence can reasonably sustain only that conclusion. Any contrary verdict would be manifestly against the weight of the evidence. Danielson v. St. Paul Fire & Marine Ins. Co., 256 Minn. 283, 98 N.W.2d 72 (1959). Judgment affirmed.